1

2

3

4

5

6

7

8             IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10   DEREK TATE,

11              Petitioner,              No. CIV S-02-2337 MCE GGH P

12       vs.

13   ANTHONY LAMARQUE,

14              Respondent.              FINDINGS AND RECOMMENDATIONS

15   _____/

16   I. Introduction

17              Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas

18   corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2000 conviction for first degree

19   residential burglary and two misdemeanor counts of resisting arrest.  Petitioner was also found to

20   have suffered two prior serious or violent felony convictions.  Petitioner is serving a sentence of

21   31 years to life.

22              This action is proceeding on the amended petition filed May 20, 2005, as to the

23   following claims: 1) the trial court abused its discretion when it permitted introduction of prior

24   bad acts evidence against petitioner; 2) the trial court abused its discretion when it denied

25   petitioner's motion to testify; 3) counsel was ineffective for failing to investigate and challenge

26   the prior bad acts evidence; 4) the trial court improperly granted petitioner's motion to represent

1

1    himself; 5) the trial court improperly denied petitioner's motion for a continuance; 6) the

2    prosecution committed misconduct by withholding evidence in violation of Brady.[1]

3              After carefully reviewing the record, the court recommends that the petition be

4    denied.

5    II.  Anti-Terrorism and Effective Death Penalty Act (AEDPA)

6              The Antiterrorism and Effective Death Penalty Act (AEDPA) applies to this

7    petition for habeas corpus which was filed after the AEDPA became effective.  Neelley v. Nagle,

8    138 F.3d 917 (11th Cir.), citing Lindh v. Murphy, 521 U.S. 320, 117 S. Ct. 2059 (1997).  The

9    AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential

10   standards of review to be used by a federal habeas court in assessing a state court's adjudication

11   of a criminal defendant's claims of constitutional error.  Moore v. Calderon, 108 F.3d 261, 263

12   (9th Cir. 1997).

13             In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme

14   Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion

15   for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy

16   between "contrary to" clearly established law as enunciated by the Supreme Court, and an

17   "unreasonable application of" that law.  Id. at 1519.  "Contrary to" clearly established law applies

18   to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme

19   Court on a point of law, or (2) if the state court case is materially indistinguishable from a

20   Supreme Court case, i.e., on point factually, yet the legal result is opposite.

21             "Unreasonable application" of established law, on the other hand, applies to

22   mixed questions of law and fact, that is, the application of law to fact where there are no factually

23   on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

24   _____

25        [1]  The other claims raised in the amended petition have been dismissed as either being
     barred by the statute of limitations or not exhausted.  See orders filed January 11, 2006, and
26   March 8, 2006.

1   <u>Williams (Terry)</u>, 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the

2   AEDPA standard of review which directs deference to be paid to state court decisions.  While the

3   deference is not blindly automatic, "the most important point is that an *unreasonable* application

4   of federal law is different from an incorrect application of law....[A] federal habeas court may not

5   issue the writ simply because that court concludes in its independent judgment that the relevant

6   state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

7   that application must also be unreasonable."  <u>Williams (Terry)</u>, 529 U.S. at 410-11, 120 S. Ct. at

8   1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

9   objectively unreasonable nature of the state court decision in light of controlling Supreme Court

10  authority.  <u>Woodford v. Viscotti</u>, 537 U.S. 19, 123 S. Ct. 357 (2002).

11          The state courts need not have cited to federal authority, or even have indicated

12  awareness of federal authority in arriving at their decision.  <u>Early v. Packer</u>, 537 U.S. 3, 123 S.

13  Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

14  contrary to, or an unreasonable application of, established Supreme Court authority.  <u>Id</u>.  An

15  unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

16  occurred.  <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the

17  established Supreme Court authority reviewed must be a pronouncement on constitutional

18  principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

19  binding only on federal courts.  <u>Early v. Packer</u>, 537 U.S. at 9, 123 S. Ct. at 366.

20          However, where the state courts have not addressed the constitutional issue in

21  dispute in any reasoned opinion, the federal court will independently review the record in

22  adjudication of that issue.  "Independent review of the record is not de novo review of the

23  constitutional issue, but rather, the only method by which we can determine whether a silent state

24  court decision is objectively unreasonable."  <u>Himes v. Thompson</u>, 336 F.3d 848, 853 (9th Cir.

25  2003).

26  /////

1    When reviewing a state court's summary denial of a claim, the court "looks

2  through" the summary disposition to the last reasoned decision.  Shackleford v. Hubbard, 234

3  F.3d 1072, 1079 n. 2 (9th Cir. 2000).  As to each claim, this court will discuss which state court

4  opinion is entitled to AEDPA deference.

5  III.  Background

6    The opinion of the California Court of Appeal contains a factual summary.  After

7  independently reviewing the record, the court finds this summary to be accurate and adopts it

8  below:

9    The victim of the current burglary, Tamera D., lived in an apartment in Redding.
   She came home at about noon on September 9, 1998, after a 12-hour absence.

10   Upon entering the kitchen, she saw [petitioner], a stranger to her, standing in the
   corner near the stove.  She was scared and immediately ran out of her apartment.

11   About 30 second later, defendant walked out of the apartment.  Tamera was angry
   at him, followed him, and yelled that she was going to call the police.  Defendant

12   told her that he thought the apartment was abandoned.

13   Police officers arrived at the scene within five minutes after Tamera had seen the
   defendant in her kitchen.  She went into the apartment with an officer, who

14   pointed out a pot of eggs boiling on the stove.  Tamera had not left the pot of eggs
   there and had not been cooking before leaving 12 hours earlier.  She also noticed

15   that her cable TV box was turned off even though she typically left it on.

16   Tamera returned with officers the next day.  On the bathroom floor she found a
   strip that had been torn from one of her previously intact bath towels.  On the

17   clothes hamper she also saw food stamps that were not hers.  While moving out of
   the apartment about a week later, Tamera found various items under her bed,

18   namely, a 14-inch kitchen knife, a bottle of vodka, a bottle of baby oil, a cigarette
   lighter, a package of loose tobacco, cigarette rolling papers, and a pile of

19   additional strips torn from her bath towel.  Only the towel strips and knife
   belonged to her, but she had last seen the knife in her kitchen prior to September

20   9.  Defendant's palm print was on the vodka bottle.  Defendant did not remove
   any of Tamera's property from the apartment.

21

22  Exhibit A to respondent's motion for summary dismissal filed October 27, 2005, pp. 2-3.

23  IV.  Discussion

24    A.  Prior Bad Acts Evidence

25    Petitioner argues that his right to due process was violated when the trial court

26  admitted evidence of his prior bad acts from 1988.  The prior bad acts were admitted to prove

4

intent, identity and propensity.  The background to this claim is set forth in the California Court of Appeal:

> Lori L., defendant's victim in the 1988 incident, testified at trial as follows: In 1988 she was 23 years old and lived alone in a small house in Redding.  She arrived home at 10:00 p.m. after having been at night school for about two hours. Lori also worked full time and had been gone most of the day, having come home briefly only to change clothes before leaving for school.

> Lori entered her kitchen and noticed that although her stove was off, one of the burners was hot.  She had not been cooking before going to school.  As she turned to use the phone, defendant walked up behind her, and, wielding a knife, told her to put down the phone.  Lori was so scared she urinated in her pants.  Defendant made her sit on the floor and rambled at her about a supposed drug rip-off, of which she knew nothing.  Defendant smoked a cigarette and drank from a bottle of whiskey.  He threatened her with the knife constantly.

> Defendant forced Lori into her bedroom and made her take off her pants, saying it was to prevent her from trying to escape.  When she tried to get away, he put her in a headlock and stabbed her in the face; she blocked his next stabbing attempt with her hand, suffering a cut finger.  Defendant then forced Lori to remove all of her clothing.  When defendant started disrobing, Lori made another unsuccessful escape attempt.  She scuffled again with defendant, who threatened to kill her and said he was going to have her "dead or alive."

> While Lori was naked, defendant moved his knife down her back, between her legs, and in her crotch area.  He touched her breasts and made her lie supine with her legs spread.  Defendant, also naked, got on top of Lori and forced her to take a sip of whiskey.  He then forced his penis into her mouth and told her to suck it. Defendant also attempted to have intercourse with her, touching her vaginal area with his penis but he did not penetrate her.

> About 90 minutes after the incident began, defendant granted Lori's request that she be allowed to shower off the blood from her stab wounds.  However, defendant got in the shower with her and touched her breasts and genitals.  After showering, she asked for a towel, but defendant refused, saying he wanted to have sex with her while she was wet.  He wanted her to return to the bedroom so they could have sex.

> Lori then tricked defendant: she told him she would have sex with him if he would get his bottle of whiskey (which was still in the bedroom) and come into the living room.  He hesitated at first but then went toward the bedroom, for the first time letting her get more than a few feet away from him.  Lori grasped the opportunity, ran out of the house screaming, and got help at a neighbor's home. In addition to sexually assaulting Lori, defendant also stole $40 from her home.

> As noted, the prosecution sought admission of the 1988 incident under section 1110(b) and 1108.  [Footnote 2]  After holding a hearing on the motions, the trial

> [Footnote 2: Section 1101, subdivision (a) provides: "Except as provided

in this section and in Section 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to provide his or her conduct on a specified occasion."

Section 1101(b) provides: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

Section 1108, subdivision (a) provides: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352."]

court ruled the 1988 incident was admissible under section 1101(b) to establish intent and identity and admissible under section 1108 to show propensity.  The court believed the evidence was "very probative on the issues of identity, and even more so on intent," both of which were at issue in the case.  After performing the required balancing, the court also found that section 352 did not require exclusion of the evidence.

Id., pp. 3-6.

A writ of habeas corpus is available under 28 U.S.C. § 2254(a) only on the basis of some transgression of federal law binding on the state courts.  Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  It is unavailable for alleged error in the interpretation or application of state law.  Middleton v. Cupp, 768 F.2d at 1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986).  Habeas corpus cannot be utilized to try state issues de novo.  Milton v. Wainwright, 407 U.S. 371, 377, 92 S. Ct. 2174, 2178 (1972).

The Supreme Court has reiterated the standards of review for a federal habeas court.  Estelle v. McGuire, 502 U.S. 62, 112 S. Ct. 475 (1991).  In Estelle v. McGuire, the Supreme Court reversed the decision of the Court of Appeals for the Ninth Circuit, which had granted federal habeas relief.  The Court held that the Ninth Circuit erred in concluding that the

6

1   evidence was incorrectly admitted under state law since, "it is not the province of a federal

2   habeas court to reexamine state court determinations on state law questions." Id. at 67-68, 112 S.

3   Ct. at 480.  The Court re-emphasized that "federal habeas corpus relief does not lie for error in

4   state law." Id. at 67, 112 S. Ct. at 480, citing Lewis v. Jeffers, 497 U.S. 764, 110 S. Ct. 3092,

5   3102 (1990), and Pulley v. Harris, 465 U.S. 37, 41, 104 S. Ct. 871, 874-75 (1984) (federal courts

6   may not grant habeas relief where the sole ground presented involves a perceived error of state

7   law, unless said error is so egregious as to amount to a violation of the Due Process or Equal

8   Protection clauses of the Fourteenth Amendment).

9         The Supreme Court further noted that the standard of review for a federal habeas

10  court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of

11  the United States (citations omitted)." Id. at 68, 112 S. Ct. at 480.  The Court also stated that in

12  order for error in the state trial proceedings to reach the level of a due process violation, the error

13  had to be one involving "fundamental fairness," Id. at 73, 112 S. Ct. at 482, and that "we 'have

14  defined the category of infractions that violate "fundamental fairness" very narrowly.'" Id. at 73,

15  112 S. Ct. at 482.  Habeas review does not lie in a claim that the state court erroneously allowed

16  or excluded particular evidence according to state evidentiary rules.  Jammal v. Van de Kamp,

17  926 F.2d 918, 919 (9th Cir. 1991).

18        In the instant case, the California Court of Appeal found that the prior bad act

19  evidence was admissible to prove intent and identity pursuant Cal. Evid. Code § 1101(b):

20           "Evidence of intent is admissible to prove that, if the defendant committed the act
             alleged, he or she did so with the intent that comprises an element of the charged
21           offense.  'In proving intent, the act is conceded or assumed; what is sought is the
             state of mind that accompanied it.' [Citation.]" (People v. Ewoldt (1994) 7 Cal.4th
22           380, 394 fn. 2 (Ewoldt).)  Here, one issue in the case was whether defendant, if he
             was the person Tamera found in her apartment, had entered "with intent to
23           commit grand or petit larceny or any felony," an essential element of burglary.
             (Pen. Code, § 459.)  Defense counsel conceded that much, arguing to the jury that
24           the two main issues in the case were intent and identity.  Indeed, one defense
             theory was that the person who entered Tamera's apartment was seeking only
25           food and shelter. [Footnote 3.]

26  \\\\\

7

[Footnote 3: In light of that defense, apparently based on defendant's statement to Tamera that he thought the apartment was abandoned the jury was instructed on the crime of misdemeanor unauthorized entry of a dwelling (Pen. Code, § 602.5) as a lesser included offense of burglary.]

The 1988 incident was sufficiently similar to the current incident to warrant admission under section 1101(b) to help show whether defendant harbored the requisite intent for burglary. "The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. [Citation.]...In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant '"probably harbor[ed] the same intent in each instance." [Citation.]'" (Ewoldt, supra, 7 Cal.4th at p. 402.)

The 1988 and 1998 incidents were similar in several ways. In both cases, defendant entered women's residences in Redding, did so while the victims were not at home, and used their stoves before the women returned. Both cases involved knives and bottles of hard liquor. In the 1988 case, defendant committed forcible sexual acts against Lori, including an unsuccessful attempt at penetration. Here, defendant made preparations which could be reasonably inferred were aimed at perpetrating forcible sexual acts against Tamera based on, e.g., the knife, towel strips (apparently to bind the victim), and baby oil (apparently as a lubricant to facilitate penetration).

The 1988 incident was also admissible because it tended to show defendant was the person in the apartment. Defendant made identity a main issue in this case: he moved to dismiss on the ground that asserted exculpatory evidence–a tape recording of Tamera's 911 call to police–had been destroyed, contending that he did not fit the description she supposedly gave the 911 operator; he moved to exclude evidence that Tamera identified him in a photo lineup on the ground the procedure was unduly suggestive and to preclude her from identifying him in court on the ground that identification had been tainted by the lineup; the court granted his pretrial request that Tamera be excluded from the courtroom until she was called as a witness; he argued to the jury that the police arrested the wrong man and that Tamera's identification of him was mistaken; and he argued at trial that the vodka bottle bearing his palm print was planted in the apartment by the police and Tamera.

"Evidence of identity is admissible where it is conceded or assumed that the charged offense was committed by someone in order to prove that the defendant was the perpetrator." (Ewoldt, supra, 7 Cal.4th at p. 394, fn. 2.) "The greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity. For identity to be established, the uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts. [Citation] 'The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.'" (Id. at p. 402.)

Although the evidence of the 1988 incident may have been more powerful on the issue of intent, it still has probative value with respect to identity. The highly idiosyncratic common fact of stove use, combined with the other similarities we

8

have already mentioned, supported an inference that the person who committed the 1988 offenses was the same one person who committed the current burglary.

Further, the trial court did not abuse its discretion in declining to exclude the section 1101(b) evidence under section 352.  The 1988 incident was highly probative of defendant's intent as to the current burglary charge, and also probative as to identity, and as to neither issue was its probative value "substantially outweighed" by the probability that its admission would create a "substantial danger of undue prejudice,..." (§ 352.)  Nor would the 1988 incident confuse the issues or mislead the jury (§ 352); rather, that evidence would assist the jury in determining whether the intent element of the burglary charge was satisfied in this case and whether defendant was the perpetrator.

We disagree with defendant's view that the 1988 incident was "far more inflammatory" than the currently charged burglary.  (See People v. Harris (1998) 60 Cal.App.4th 727, 737-738 [important factor in section 352 analysis is whether evidence of the uncharged acts is more inflammatory than that concerning the charged acts; abuse of discretion found where, inter alia, prior act evidence was "inflammatory in the extreme" and was also speculative].)  The fact that there was no sexual attack in the current case is not significant, since all indications are that a violent sexual attack on Tamera would have occurred had she not quickly left the premises.  The court did not abuse its discretion by admitting the evidence.

Exhibit A to respondent's motion for summary dismissal filed October 27, 2005, pp. 3-10.

Petitioner must be alleging that the prior acts evidence could not have properly been admitted for identity or intent purposes, so therefore it constituted propensity evidence.[2] The Supreme Court has expressly left open the issue of whether prior bad acts evidence used to show propensity to commit the crime at issue violates due process; therefore, petitioner cannot prevail on this claim given AEDPA.  Alberni v. McDaniel, 458 F.3d 860 (9th Cir. 2006).  It does not matter what the nature of state law is on the issue, i.e., whether the trial court was correct in its determination of the use of such evidence to show intent and identity.  Nor does it matter if the state court would have come to the conclusion (but for a procedural bar) that the state law permitting use of propensity evidence in sexual attack cases was improperly applied in this burglary case.  The use of such evidence must contravene established Supreme Court authority,

---

[2] If petitioner contended that the evidence was properly admitted for identity and/or intent, there could not possibly be a due process violation in that admission of evidence for those purposes is universally admissible.  See e.g. Fed. R. Ev. 404(b).

1    and such cannot be said at this time.[3]

2          For these reasons, the court finds that admission of the prior bad act evidence to

3    prove intent and identity did not violate fundamental fairness.

4          B.  Denial of Motion to Testify

5          *Background*

6          The facts regarding this claim are summarized in respondent's answer.  After

7    independently reviewing the record, the court finds this summary to be accurate and adopts it

8    below, with a few additions from the record.

9          At the beginning of criminal proceedings, petitioner refused to cooperate with the

10   examining doctor during his California Penal Code section 1368 evaluation. RT at 61.  On

11   September 6, 2000, the trial court permitted petitioner to represent himself.  The court explained

12   that defense investigator Robbie Wharton would continue as petitioner's investigator.  The court

13   appointed defense counsel Jeffrey Stotter to act as standby counsel.  Petitioner spoke to Wharton

14   on at least one occasion, and Wharton conveyed information to the court on petitioner's behalf.

15   Petitioner knew that Wharton was his investigator, and that Wharton was available to transmit

16   moving papers to the court on petitioner's behalf.  RT at 135-145, 150-154.  During the

17   discussion of petitioner's self-representation, the court warned petitioner that his right to

18   represent himself could be terminated and misbehavior on his part could result in his removal

19   from the courtroom.  RT at 140.

20         On November 21, 2000, petitioner changed his mind about self-representation and

21   Mr. Stotter was reappointed.  Petitioner asked the court what he should do if he wanted to testify.

22   The court told petitioner that he should tell his attorney.  RT at 252.

23

24         [3] The court need not reach the state appellate court's use of procedural bar to deny
     petitioner's claim in the state court that use of the prior bad acts pursuant to Cal. Evidence Code
25   § 1108.  All might agree that use of such propensity evidence may well have been improper
     under that state law code section, but if federal relief is not possible, the issue of whether
26   petitioner waived his state law argument is a moot point.

1    After one of petitioner's many requests to replace his attorney was denied,

2 petitioner refused to participate in the proceedings.  RT at 477-478.  The court expressed

3 frustration with petitioner:

> The record will reflect that Mr. Dervin has returned.  Mr. Dervin, the Marsden hearing, the motion to substitute counsel, was denied.  Mr. Tate refuses to participate in these proceedings and has voluntarily left the courtroom with the assistance of the deputy sheriff–deputy marshals.  It would be my intention to proceed with the trial in his absence.  He has the right to not be present if that's his choice, and I will inquire at different opportunities–different times during the trial directly to him to see if he wishes to return to the courtroom and if he can be present.  I am not going to strap him down to that chair and make him sit there gagged.  It is my opinion, I don't what else I can do with Mr. Tate.  I think I have been more than patient than I possibly could be with anybody, so we–I will double check the law before we proceed, but I feel quite certain that we should not stop this trial because Mr. Tate disagrees with my decision to fire Mr. Stotter.  There is simply no basis upon which to do so.

11 RT at 477.

12    Shortly thereafter, the court ordered petitioner returned to the courtroom.  RT at

13 479.  Petitioner resisted the officers' efforts to have him returned.  RT at 479.  It took four to five

14 officers to drag petitioner back to the courtroom.  RT at 479, 484.  Defense counsel told the court

15 that he had concerns for his own safety as a result of petitioner's behavior and asked the court to

16 absent petitioner rather than restrain him in front of the jury.  RT at 480.

17    Outside of the presence of the jury the court warned petitioner,

> Mr. Tate, I have attempted throughout this trial to be fair with you, to listen to you, and treat you fairly and with respect, and I want you to remain in the courtroom, and I would hope that you would remain in the courtroom, and if you choose not to participate and not say anything, not to assist your counsel, that's your choice, but I would like you to be seated here at the table, and if I need to strap you down to the table, to the chair, I am willing to do that.  Are you prepared to conduct yourself appropriately in front of the jury and not sabotage yourself?

22 RT at 482.

23    Petitioner refused to respond.  RT at 482.  The court further explained that

24 petitioner could stay in the courtroom if he sat at the table and remained quiet.  Petitioner was

25 handcuffed because he posed a threat to his attorney and the deputies in the courtroom.  Also, the

26 court allowed defense counsel to try and discuss matters with petitioner before the jury was

11

1   brought back in, but petitioner refused to speak to his attorney.  RT at 483.

2           When the jury panel was brought back into the courtroom, petitioner blurted out,

3   "They're forcing me to go forward with this guy as my lawyer."  RT at 485-486.  The court

4   admonished petitioner to be quiet, but continued, "He doesn't have my best interest, and he

5   hasn't represented me in the past–" RT at 486.  The court implored petitioner to be quiet again,

6   but he refused to stop.  RT at 486.  The court directed the jurors to exit, and petitioner continued

7   to blurt out, "And I was forced to take this guy back on.  This is the type of representation they

8   give black men in Shasta County.  You need to be aware of that.  None whatsoever."  RT at 486.

9           The court found that despite its previous warning, petitioner was disruptive.  RT

10  at 486.  The court told petitioner that he was being removed from his courtroom as a result of his

11  disruptive behavior, but he could come back to court if he agreed to behave properly.  RT at 486.

12  The court told petitioner, "merely advise the jail that you are ready to conduct yourself

13  appropriately, and I will have you escorted back over here."  RT at 486.  The court asked

14  petitioner if he understood, and he refused to answer.  RT at 487.  Petitioner was removed and

15  jury selection resumed.  RT at 487.

16          On November 30, 2000, as the parties (petitioner remained absent) were preparing

17  for the evidentiary presentation to begin, the court and counsel discussed how they should

18  proceed with the need to have Tamera try to identify petitioner in court, in light of his disruptive

19  behavior.  The court noted that petitioner physically resisted transportation the preceding day.

20  RT at 554.  Defense counsel consented to having petitioner photographed so Tamera could try to

21  identify him in a new line-up.  The court ordered deputies to photograph petitioner.  RT at 555-

22  558.  The court left open the possibility that petitioner would be forcibly brought to court for an

23  attempted identification.  RT at 558.

24          Petitioner refused to cooperate with the officers when they tried to photograph

25  him.  Petitioner covered his face with his hand in one photograph, and he closed his eyes during a

26  second attempt.  RT at 583.  As a result of petitioner's refusal to be photographed, the court

12

1   ordered petitioner brought back to open court so the victim could try and identify him.  The court

2   discussed having petitioner present in court for as little time as possible, and the court pondered

3   gagging petitioner because of the likelihood that he would be vocally disruptive.  RT at 583-584,

4   608.  The court opined that petitioner was "very manipulative and clever" and trying to create

5   reversible errors through his behavior.  RT at 609.  Defense counsel did not object to the

6   identification procedures outlined by the court.  RT at 609.

7           Prior to bringing petitioner to court, the court asked defense counsel to visit with

8   petitioner to see if he could be brought to court without the need for a gag.  RT at 644.  Petitioner

9   refused to speak with his attorney.  RT at 644.  Therefore, petitioner was brought to the court in

10  shackles with tape covering his mouth.  RT at 679.

11          Immediately after the prosecutor asked the witness if she could identify the person

12  who entered her apartment, petitioner managed to remove the tape covering his mouth and

13  exclaim, "Ladies and gentlemen, you should be aware that this is a three strike case."  RT at 646.

14  The court removed petitioner and admonished the jury to ignore the disruption.  RT 646-647,

15  679-680.  Petitioner was only in the courtroom for ten seconds.  RT at 680.

16          Later that day, petitioner's attorney was trying to determine if petitioner should be

17  evaluated pursuant to California Penal Code section 1368 a second time, and the attorney told the

18  court that petitioner refused to communicate with him and behaved "by way of outbursts."  RT at

19  706.

20          After several days off, the matter resumed on December 5, 2000.  RT at 707-708.

21  The court directed the defense investigator to contact petitioner at the jail to ask him if he wanted

22  to testify on his own behalf.  RT at 780.  When the defense investigator returned to court, he

23  explained that petitioner refused to see him.  RT at 871-872.  Then the court asked defense

24  counsel and the investigator directly if they had any understanding that petitioner wanted to

25  testify.  RT at 873.  Neither had any information that petitioner had expressed a desire to testify.

26  RT at 873.

1    The court made a record that petitioner refused to speak with the court, counsel or

2  his investigator.  Petitioner only spoke to the jury in an improper manner.  Petitioner gave up the

3  right to be present in court as a result of his disruptions.  The court reiterated that petitioner could

4  return to court if he was willing to conduct himself appropriately.  RT at 878-879.  Defense

5  counsel agreed with the court's factual interpretation.

6    On December 6, 2000, the defense attorney rested his presentation of evidence

7  and the matter was submitted to the jury for deliberation at about 3:15 p.m.  RT at 941.  The jury

8  deliberated from approximately 3:30 p.m. to 5 p.m.  CT at 439-440.  The jury did not deliberate

9  on December 7, 2000.  RT at 948-949.

10    On December 8, 2000, the court told the attorneys that the court received a letter

11  from petitioner at 5:05 p.m. on December 6, 2000.  RT at 949.  Petitioner's handwritten note

12  stated: "I Derek Tate do hereby declare my right to testify on my own behalf in the above matter.

13  Please be advised and make the necessary arrangements.  I want to testify on my own behalf!

14  Defendant Derrek Tate 12-4-2000."  CT Supp. 11.  Defense counsel confirmed that petitioner

15  had not expressed any desire to testify before deliberations began.  RT at 951.

16    The court commented that it checked with court staff on the morning of December

17  6, 2000, before jury deliberations began and petitioner had not expressed any desire to testify.

18  RT at 953.  In addition, the court disagreed with defense counsel's suggestion that petitioner's

19  jail custody made it difficult for him to speak with the court in a timely fashion.  RT at 955.  The

20  court related that all petitioner had to do was tell the jail staff that he wanted to testify and they

21  would have informed the court.  The court reflected this type of arrangement had worked

22  effectively in the past.  RT at 955.

23    The court concluded, based upon all of the circumstances, that petitioner's request

24  to testify was untimely, and he did not act diligently.  RT at 956.  The trial court was suspicious

25  that the date of December 4, 2000, that petitioner placed on his request to testify may not have

26  been accurate or truthful.  RT at 952.  The court perceived petitioner's letter as another clever

14

1  attempt by him to inject error into the case.  RT at 953.  The jury deliberated an additional hour

2  and 12 minutes on December 8, 2000, before arriving at verdicts of guilt.  CT at 457-458.

3        Following the verdicts, a bifurcated jury trial on the issue of petitioner's prior

4  convictions was held.  Petitioner was brought to the courtroom, and engaged in the following

5  colloquy with the court:

6        Defendant: I am not testifying, so why am I here?

7        Court: You have indicated you wished to testify.

8        Defendant: I changed my mind.

9  RT at 976.

10        Petitioner thereafter refused to respond when the court asked him twice to clarify

11  whether he wanted to testify during the bifurcated proceedings.  RT at 976.  The court had

12  petitioner removed from the courtroom.  RT at 976.

13        *Analysis*

14        A criminal defendant has a constitutional right to testify in his own defense.  Rock

15  v. Arkansas, 483 U.S. 44, 49, 107 S. Ct. 2704, 2708 (1987).  The right is not without limitation,

16  however.  Id. at 55, 107 S. Ct. at 2711.  It may, in appropriate cases, "bow to accommodate other

17  legitimate interests in the criminal trial process," so long as such restrictions on the right to

18  testify are not "arbitrary or disproportionate to the purposes they are designed to serve."  Id. at

19  55-56, 107 S. Ct. at 2711-2712.

20        One of those restrictions on the right to testify has to do with a valid banishment

21  from the courtroom due to obstreperous behavior.  See Illinois v. Allen, 397 U.S. 337, 90 S. Ct.

22  1057 (1970).  If one can be validly banished from the courtroom, and petitioner does not contest

23  his banishment, one perforce loses several constitutional rights, including that of testifying before

24  the jury.  United States v. Ives, 504 F.2d 935 (9th Cir. 1974), vacated on other grounds, 421 U.S.

25  944, 95 S. Ct. 1671 (1975).  Moreover, the court bent over backwards to give petitioner the

26  opportunity to change his mind about his behavior and his stated desire that he not testify.  The

15

1   undersigned does not see what more the trial court could have realistically done.

2          Furthermore, in the instant case, it cannot be said that the denial of petitioner's

3   belated request to testify was unjustified.  The trial court's finding that the request was untimely

4   was supported by the record.  Petitioner's letter requesting to testify was received by the court on

5   December 6, 2000, at 5:05 p.m.  At 3:30 p.m. that day, the defense had rested and the matter had

6   been presented to the jury.  The court had checked with court staff on the morning of December

7   6, 2000, and petitioner had expressed no desire to testify.

8          While the request was dated December 4, 2000, the court was suspicious that the

9   letter had been backdated.  On December 5, 2000, petitioner had refused to see his investigator,

10  who wanted to discuss with petitioner whether he wanted to testify.  On December 5, 2000, both

11  petitioner's counsel and the investigator informed the court that they had no information that

12  petitioner wanted to testify.  Earlier in the proceedings, the court had told petitioner that if he

13  wanted to testify he should tell his lawyer.  In making the request to testify, petitioner did not

14  follow this procedure.  For that reason, the court and defense counsel had no reason to believe

15  that petitioner wanted to testify.  For these reasons, the court finds that the trial court's finding

16  that the request was untimely was reasonable.  See United States v. Pino-Noriega, 189 F.3d 1089

17  (9th Cir. 1999) (defendant who waited to tell the judge he wanted to testify until after case went

18  to the jury, and before verdict was announced, waived his right to testify).

19         The California Court of Appeal was the last state court to issue a reasoned opinion

20  addressing this claim.  Because the denial of this claim by the California Court of Appeal was not

21  an unreasonable application of clearly established Supreme Court authority, this claim should be

22  denied.

23         C.  Ineffective Assistance of Counsel

24         *Legal Standard*

25         The test for demonstrating ineffective assistance of counsel is set forth in

26  Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984).  First, a petitioner must show

1  that, considering all the circumstances, counsel's performance fell below an objective standard of

2  reasonableness. Strickland, 466 U.S. at 688, 104 S. Ct. at 2065.  To this end, the petitioner must

3  identify the acts or omissions that are alleged not to have been the result of reasonable

4  professional judgment. Id. at 690, 104 S. Ct. at 2066.  The federal court must then determine

5  whether in light of all the circumstances, the identified acts or omissions were outside the wide

6  range of professional competent assistance. Id., 104 S. Ct. at 2066.  "We strongly presume that

7  counsel's conduct was within the wide range of reasonable assistance, and that he exercised

8  acceptable professional judgment in all significant decisions made." Hughes v. Borg, 898 F.2d

9  695, 702 (9th Cir. 1990) (citing Strickland at 466 U.S. at 689, 104 S. Ct. at 2065).

10       Second, a petitioner must affirmatively prove prejudice. Strickland, 466 U.S. at

11  693, 104 S. Ct. at 2067.  Prejudice is found where "there is a reasonable probability that, but for

12  counsel's unprofessional errors, the result of the proceeding would have been different." Id. at

13  694, 104 S. Ct. at 2068.  A reasonable probability is "a probability sufficient to undermine

14  confidence in the outcome." Id., 104 S. Ct. at 2068.

15       In extraordinary cases, ineffective assistance of counsel claims are evaluated

16  based on a fundamental fairness standard. Williams v. Taylor , 529 U.S. 362, 391-93, 120 S. Ct.

17  1495, 1512-13 (2000), (citing Lockhart v. Fretwell, 113 S. Ct. 838, 506 U.S. 364 (1993)).

18       The Supreme Court has recently emphasized the importance of giving deference

19  to trial counsel's decisions, especially in the AEDPA context:

20  > In Strickland we said that "[j]udicial scrutiny of a counsel's
   > performance must be highly deferential" and that "every effort

21  > [must] be made to eliminate the distorting effects of hindsight, to
   > reconstruct the circumstances of counsel's challenged conduct, and

22  > to evaluate the conduct from counsel's perspective at the time."
   > 466 U.S., at 689, 104 S.Ct. 2052.  Thus, even when a court is

23  > presented with an ineffective-assistance claim not subject to §
   > 2254(d)(1) deference, a [petitioner] must overcome the

24  > "presumption that, under the circumstances, the challenged action
   > 'might be considered sound trial strategy.'" Ibid. (quoting Michel

25  > v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).

26       For [petitioner] to succeed, however, he must do more than show

that he would have satisfied <u>Strickland's</u> test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied <u>Strickland</u> incorrectly.  <u>See Williams</u>, <u>supra</u>, at 411, 65 S. Ct. 363.  Rather, he must show that the [ ]Court of Appeals applied <u>Strickland</u> to the facts of his case in an objectively unreasonable manner.

<u>Bell v. Cone</u>, 535 U.S. 685, 698-699, 122 S. Ct. 1843,1852 (2002).

*Analysis*

Petitioner argues that his counsel was ineffective for failing to challenge admission of his prior bad act evidence upon grounds that its admission violated Cal. Evid. Code § 1108.  The California Court of Appeal addressed this claim:

> Defendant also contends the 1988 incident was not made admissible by section 1108 because burglary is not a "sexual offense" as defined for purposes of that section.  As we shall explain, defendant is correct, but he waived the claim on appeal by not objecting below, and he has not established ineffective assistance of counsel entitling him to relief because counsel's failure to make the proper objection did not prejudice him.

> Section 1108 applies when "the defendant is accused of a sexual offense,..." (§ 1108, subd. (a).)  Subdivision (d) of section 1108 defines the term "sexual offense." [Footnote omitted.] None of the criminal conduct described in that definition includes burglary, not even a burglary committed with the intent to commit one or more species of listed conduct.

> The People posit that subdivision (d)(1)(E) of section 1108–making an "attempt or conspiracy to engage in conduct described" a "sexual offense"–applies because defendant "attempted" to engage Tamera in an enumerated sexual offense.  The People's argument fails because defendant was not charged with an attempt (Pen. Code § 664) to sexually assault Tamera.  When the legislature expressly includes certain offenses in a statute, it intends to exclude those not mentioned.  (People v. Sanchez (1997) 52 Cal.App.4th 997, 1001.)  We will not rewrite the plain language of the statute to include burglary.  (See People v. Walker (2000) 85 Cal.App.4th 969, 972-973.)

> *****

> Defendant asserts that if we deem the error waived on appeal, then he received ineffective assistance of counsel at trial.  To prevail on that claim, defendant must show both: (1) deficient performance by trial counsel; and (2) that the deficient performance prejudiced him.  (People v. Hart (1999) 20 Cal.4th 546, 623 (Hart).)  "Prejudice" means a reasonable probability that defendant would have obtained a better result but for counsel's error, and a "reasonable" probability is one which undermines confidence in the outcome.  (Id. at pp. 623-624.) [Footnote omitted.]

18

1   We find that defendant's trial attorney acted deficiently by not specifically
     objecting to admission of the 1988 incident on the ground burglary is not a
2   "sexual offense."  However, considering all the circumstances of this case
     (including the highly incriminating evidence defendant left under Tamera's bed
3   and that the 1988 incident was properly admitted for section 1101(b) purposes) it
     is not reasonably probable that defendant would have obtained a better result if the
4   incident had not been admitted for section 1108 purposes.  Accordingly, counsel's
     omission did not prejudice defendant and the ineffective assistance of counsel
5   claim fails.

6   Exhibit A to respondent's motion for summary dismissal filed October 27, 2005, pp. 10-12.

7          Based on the reasoning of the California Court of Appeal, the court finds that

8   petitioner was not prejudiced as a result of counsel's failure to challenge admission of the prior

9   bad acts pursuant to Evid. Code § 1108.  Accordingly, petitioner's ineffective assistance of

10  counsel claim is without merit.

11         The California Court of Appeal was the last state court to issue a reasoned opinion

12  addressing this claim.  Because the denial of this claim by the California Court of Appeal was not

13  an unreasonable application of clearly established Supreme Court authority, this claim should be

14  denied.

15         D.  Improper Grant of Request for Self Representation and Denial of Motion for

16  Continuance

17         Petitioner argues that the trial court should not have granted his motion for self-

18  representation if it was not going to grant his motion for a continuance.  The Sixth Amendment

19  guarantees the right of a defendant to represent himself.  Faretta v. California, 422 U.S. 806, 95

20  S. Ct. 2525 (1975).

21         In Armant v. Marquez, 772 F.2d 552 (9th Cir. 1985), the Ninth Circuit found that

22  the trial court abused its discretion by denying a request for continuance that "effectively

23  rendered [the defendant's] right to self-representation meaningless."  Id. at 558.  First, the Ninth

24  Circuit found that the defendant's request for self-representation was unequivocal, timely and not

25  a tactic to secure delay.  Id. at 556.  In determining whether the trial court abused its discretion in

26  denying the defendant's motion for a continuance under these circumstances, the Ninth Circuit

1    considered four factors.  Id. at 556.  First, the court looked at the degree of diligence by the

2    defendant prior to the date beyond which the continuance was sought.  Id.  Second, the court

3    considered whether the continuance would have served a useful purpose if granted.  Id. Third, the

4    court considered the inconvenience that granting the continuance would have caused the court or

5    the government.  Id.  Fourth, the court considered the amount of prejudice suffered by appellant.

6    Id.  "These factors must be considered together, and the weight given to any one may vary from

7    case to case."  Id.  "At a minimum, however, in order to succeed the appellant must show some

8    degree of prejudice resulting from the court's denial."  Id.

9          The court first considers whether petitioner's request for self-representation was

10    unequivocal, timely and not a tactic to secure delay.  Petitioner made his request for self-

11    representation on September 6, 2000, after the court denied his Marsden[4] motion.  RT at 133-

12    134.  September 6, 2000, was the day the jury trial was to commence.  RT at 90.  Petitioner

13    engaged in a lengthy colloquy with the trial court regarding his request, following which the

14    court granted his request.  RT at 134-143.

15          The transcript indicates that petitioner's request for self-representation was

16    unequivocal.  Although the request was made on the day of trial, the trial court did not find the

17    request untimely.  Accordingly, neither shall this court.  The trial court also made no finding that

18    petitioner's request was made to secure delay.  After reviewing the record, the court finds that

19    petitioner's request was sincere.  Accordingly, the court now considers whether the trial court

20    abused its discretion in denying petitioner's motion for a continuance.  The background to this

21    issue is as allows.

22          At the September 6, 2000, hearing, after the court granted petitioner's request for

23    self-representation, petitioner moved for a continuance in order to prepare various motions,

24    including a motion to disqualify the trial judge.  RT at 144-146.  The court did not rule on the

25

26       [4]  People v. Marsden, 2 Cal. 3d 118, 84 Cal. Rptr. 156 (1970).

                                              20

1  request for a continuance.  However, the disqualification procedure necessarily delayed the

2  proceedings.  RT at 146-146.  The court gave petitioner until September 11, 2000, to file the

3  disqualification motion.  RT at 147-148.

4  　　　　　On September 11, 2000, a hearing was held.  Criminal proceedings were stayed

5  until the disqualification motion could be ruled on.  RT at 152.  The court set a hearing for

6  October 16, 2000, because it thought the motion would be decided by that date.  RT at 152.

7  　　　　　On October 12, 2000, the court and parties reconvened.  RT at 155.  The court

8  stated that it set the hearing for further proceedings regarding trial setting.  RT at 155.  The

9  motion to disqualify had been denied.  RT at 155.  Petitioner asked for a stay of proceedings so

10  that he could file a writ with the state court of appeal.  The trial court stated that it would abide

11  by any stay ordered by the court of appeal.  RT at 155-156.  Trial was set for November 21, 2000.

12  RT at 159.

13  　　　　　On November 9, 2000, a hearing was held regarding petitioner's motion for

14  discovery of police personnel records. RT at 163.  The motion was denied.  RT at 171.

15  　　　　　On November 17, 2000, the court held a hearing on petitioner's motions for a

16  continuance and a change of venue.  RT at 172.  Petitioner told the court that he needed more

17  time to collect evidence and file additional motions.  RT at 173.  Petitioner asked the court for a

18  six month continuance.  He claimed he could not find a material witness.  RT at 173-180.

19  　　　　　The court stated that it was tentatively denying the motion for a continuance.  RT

20  at 191.  It stated that it would issue a final ruling on November 21, 2000, when it considered

21  petitioner's motion regarding discovery violations.  RT at 191.  The court denied the motion for

22  change of venue as untimely.  RT at 194.

23  　　　　　On November 21, 2000, the court addressed several defense motions.  Petitioner

24  began by arguing that the charges should be dismissed because exculpatory evidence was

25  destroyed.  RT at 199, 202, 204-212, 217-225.  The court denied the motion.  RT at 226-227.

26  Petitioner next informed the court that he was not prepared to move forward with his

1  photographic line-up motion and reiterated his request for a continuance.  RT at 227-229.

2  Petitioner stated that he needed an additional six months.  RT at 233.  The court proposed taking

3  up the issue of whether the photographic lineup was impermissibly suggestive during in limine

4  proceedings.  RT at 230-231.  The court then conducted an in camera hearing to allow petitioner

5  to further discuss the grounds for his request for a continuance.  RT at 234.  Upon returning to

6  court, petitioner told the court that he needed a continuance to find two witnesses and file more

7  motions.  RT at 244, 246-249.  The court found that petitioner had not established good cause for

8  a continuance.  RT at 250.  In denying the motion, the court observed that petitioner then decided

9  that he could not go forward representing himself so the court reappointed Mr. Stotter as counsel

10  of record.  RT at 252.

11        The court first considers petitioner's diligence prior to September 6, 2000.  Prior

12  to this date, petitioner had made three <u>Marsden</u> motions, all of which were denied.   These

13  <u>Marsden</u> hearings were held on December 1, 1998, June 3, 1999, and August 21, 1999.

14  Petitioner did not move to represent himself until after his fourth <u>Marsden</u> hearing was denied on

15  September 6, 2000, which was also the day trial was set to begin.  Under these circumstances, the

16  court does not find that petitioner acted diligently in asserting his right to self-representation.

17        The court next considers whether the continuance would have served a useful

18  purpose if granted.  As indicated above, petitioner initially requested the continuance on

19  September 6, 2000, but it was not actually denied until November 21, 2000.  During the

20  approximately 2 ½ months that petitioner represented himself, he succeeded in litigating various

21  motions.  At the November 21, 2000, hearing, petitioner stated that he wanted the continuance in

22  order to find two witnesses and file more motions.  Petitioner did not identify the witnesses or

23  motions in open court, apparently not wanting to tip the prosecutor off to his defense.  However,

24  the court held an in camera hearing where petitioner was free to discuss these issues.

25        It is petitioner's burden to demonstrate that the continuance would have served a

26  useful purpose.  None of the pleadings filed in support of the petition by petitioner discuss who

1   the witnesses were he needed to find nor identify the additional motions he intended to file.  See

2   Reply to Answer, pp. 98-112.  Accordingly, the court does not find that petitioner has met his

3   burden of demonstrating that the continuance would have served a useful purpose.

4         The court next considers the issue of whether granting the continuance would

5   have prejudiced the court or the government.  The trial lasted six days.  Recalendaring may have

6   created some difficulties for both the court and the government.  Accordingly, the court finds that

7   the government and court would have been moderately inconvenienced had the court granted

8   petitioner a continuance.

9         Finally, the court considers the issue of prejudice to petitioner as a result of the

10   denial of the request for a continuance.  In Armant the Ninth Circuit stated,

11       As we have stressed, Armant's request for a continuance was in essence a request
to meaningfully assert the right to self-representation.  Armant's need for a
12       continuance was both reasonable and apparent.  When asked whether he was
ready to go to trial on March 30, having been granted pro se status only moments
13       before, he said, "not for myself."  Before denying the continuance on March 30,
Judge Hinz knew that Armant wanted to make motions his attorney had not made,
14       wanted to call witnesses his attorney had not called, and wanted to review his
preliminary hearing transcript.  In short, Armant stated that he wanted to prepare
15       for trial, and the court's denial of a continuance prevented him from so doing.
The prejudice suffered by Armant here was not less than the effective denial of his
16       Constitutional right to self-representation.  Cf. Powell v. Alabama, 287 U.S. 45,
59, 53 S.Ct. 55, 60, 77 L.Ed.2d 158 (1932)("It is vain to give the accused a day in
17       court with no opportunity to prepare for it, or to guarantee him counsel without
giving the latter any opportunity to acquaint himself with the fact or law of the
18       case.") (quoting Commonwealth v. O'Keefe, 298 Pa. 169, 173, 148 A. 73 (1929)).

19   772 F.2d at 557.

20         The Ninth Circuit's discussion and findings regarding prejudice in Armant is

21   inapposite in the instant case.  The fact of the matter remains that petitioner did secure a de facto

22   two month continuance from the date of his initial request.  He had time to file his motions, and

23   discover the location of witnesses, to the extent that these witnesses were not simply a figment of

24   his imagination.  Most importantly, petitioner does not demonstrate today what the prejudice

25   would have been back then, i.e., he really did have witnesses who were very material to the case.

26         Considering the four factors discussed above, the court finds that the trial court

did not abuse its discretion in denying petitioner's request for a continuance.  Petitioner had not

acted diligently before making this request and nor is there any showing in the record that the

continuance would have been useful.  In addition, the government and prosecution would have

been moderately prejudiced had the request been granted.  Petitioner has not demonstrated the

specifics of his claimed prejudice.  However, the court finds that the other three factors outweigh

this one factor in finding that the trial court did not abuse its discretion.

Even if the court found that the trial court abused its discretion in denying the

request, this court would find that any error was harmless.  Constitutional error is harmless if it

did not have a substantial and injurious effect or influence in determining the jury's verdict.

California v. Roy, 519 U.S. 2, 5, 117 S. Ct. 337, 338 (1996) (per curiam).  The error is not

harmless if the court is "in grave doubt as to the harmlessness of [the] error."  Id. at 5, 117 S. Ct.

337.

In the instant case, the evidence against petitioner was strong.  Nothing in the

record suggests that petitioner would have been better able to defend his case.  Petitioner has also

not demonstrated that he was aware of exculpatory evidence that his lawyer either failed to obtain

or was unaware of that would have resulted in a different outcome.  Accordingly, the court finds

that the denial of petitioner's motion for a continuance did not have a substantial and injurious

effect in determining the jury's verdict.

Petitioner raised this claim in his habeas corpus petition filed in the California

Supreme Court.  Exhibit D to respondent's motion for summary dismissal filed October 27,

2005.  The California Supreme Court summarily denied the petition.  Id.  No other state court

issued a reasoned decision addressing this claim.  Accordingly, after independently reviewing the

record, the court finds that the denial of this claim by the California Supreme Court was not an

unreasonable application of clearly established Supreme Court authority.

E. Brady Violation

Petitioner alleges that the prosecutor violated Brady v. Maryland, 373 U.S. 83, 83

S. Ct. 1194 (1963) by damaging evidence and failing to report it to defense counsel.  Under

Brady, the prosecution has a constitutional obligation to turn material exculpatory evidence over

to the defendant.  Evidence is material "if there is a reasonable probability that, had the evidence

been disclosed to the defense, the result of the proceeding would have been different."  United

States v. Bagley, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383 (1985).

The background to this claim is as follows.  Petitioner contends that the only

direct evidence connecting him to the offense was a vodka bottle found at the victim's apartment

which contained his fingerprints.  Petitioner contends that the police damaged the label of the

bottle on which the prints were found and failed to report it to the defense.  Petitioner cites the

portion of the transcript where this issue was discussed with Redding Police Officer Martin:

Prosecutor: What's that?

Officer Martin: This is a–I believe this is going to be the top part, yeah, the top
half of the vodka label prints that I obtained, and it's one I referred to before
where part of the label had actually come off when I removed it.

Prosecutor: Did you–did you–excuse me.  Did you mark somehow on that item
the portion of the vodka bottle that it came off of?

Officer Martin: I always draw a little sketch to give me a reference as to where
they come from, and, yes, I did.

Prosecutor: So where did that one come from?

Officer Martin: It indicates that it was the top half of the label portion.

Prosecutor: Okay.  Going back to Number 10 of 15 that you have already
described, where did that come off of the vodka bottle?

Officer Martin: That would be the bottom half so it could have been below that
print there.

Prosecutor: Thank you.  After you obtained these two prints, what did you do with
them?

Officer Martin: They were placed into evidence.

RT at 853-854.

After Officer Martin testified, Mark Fisher, a latent print analyst for the California

25

1  Department of Justice testified that the fingerprints taken from the vodka bottle label were

2  petitioner's.  RT at 863-864.

3          Petitioner argues that because the label of the vodka bottle was removed, it was

4  tampered with.  Petitioner argues that the prosecutor committed <u>Brady</u> error by failing to disclose

5  to defense counsel that the vodka bottle had been tampered with.

6          As noted by respondent in the answer, prior to trial, petitioner's counsel was put

7  on notice that petitioner's fingerprints had been found on the vodka bottle.  The vodka bottle was

8  referenced at the preliminary hearing.  CT at 24.  Petitioner was also informed in a motion to

9  continue filed by the prosecution on February 24, 1999, that his prints were found on the vodka

10 bottle.  CT at 85.  Nothing in the record suggests that the removal of the label containing the

11 prints constituted improper tampering or destruction of evidence, thus warranting notice to the

12 defense.  Petitioner does not suggest why the label <u>per se</u> was exculpatory.

13         Because petitioner has not demonstrated that the fact that the label was removed

14 from the vodka bottle was exculpatory in any way, the court finds that no <u>Brady</u> violation

15 occurred.

16         Petitioner raised this claim in his habeas corpus petition filed in the California

17 Supreme Court.  Exhibit D to respondent's motion for summary dismissal filed October 27,

18 2005.  The California Supreme Court summarily denied the petition.  <u>Id.</u>  No other state court

19 issued a reasoned decision addressing this claim.  Accordingly, after independently reviewing the

20 record, the court finds that the denial of this claim by the California Supreme Court was not an

21 unreasonable application of clearly established Supreme Court authority.

22         Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a

23 writ of habeas corpus be denied.

24         These findings and recommendations are submitted to the United States District

25 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

26 days after being served with these findings and recommendations, any party may file written

26

1   objections with the court and serve a copy on all parties.  Such a document should be captioned

2   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

3   shall be served and filed within ten days after service of the objections.  The parties are advised

4   that failure to file objections within the specified time may waive the right to appeal the District

5   Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

6   DATED: 7/13/07

7                                       /s/ Gregory G. Hollows

8                                       UNITED STATES MAGISTRATE JUDGE

9   tate2337.157

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26